**OMEGA S.A.**

v.

**OMEGA ENGINEERING, INC. Omega Press, Inc., and Omega Scientific, Inc.**

No. 3:00CV1848 (JBA).

United States District Court, D. Connecticut.

Oct. 18, 2002.

Arthur T. Fattibene, Paul A. Fattibene, Southport, CT, Jess M. Collen, James R.

Hastings, Collen Law Associates, Ossining, NY, for Plaintiff.

Thomas A. Smart, Richard A. DeSevo, Kaye, Scholer, New York City, Peter W. Peterson, Robert Curcio, DeLio & Peterson, New Haven, CT, A. Jeffrey Somers, Law Offices of Larry Lewis, Meridan, CT, for Defendants.

William A. Zucker, Gadsby & Hannah, Boston, MA, for Movant.

### Ruling on Cross Motions for Summary Judgment [Doc.## 73 & 77]

ARTERTON, District Judge.

## I. Introduction

Plaintiff, Omega S.A. ("OSA"), commenced the present suit on September 27, 2000, alleging only one claim, that defendants Omega Engineering, Inc. ("OE"), Omega Press, Inc. ("OP"), and Omega Scientific, Inc. ("OS"), violated or continue to violate plaintiff's statutory rights under the Anticybersquatting Consumer Protection Act ("ACPA") (15 U.S.C. § 1125(d)) by registering and using the internet domain names OMEGAWATCH.com and OMEGATIME.com. After protracted discovery requiring multiple rulings from Magistrate Judge Joan G. Margolis, the parties cross moved for summary judgment. By order dated September 30, 2002 [Doc. # 96], the Court denied defendants' motion [Doc. # 73], and granted in part and denied in part plaintiff's motion [Doc. # 77], for the reasons that follow.

## II. Factual Background [1]

The following summarizes the undisputed facts in the summary judgment record.[2]

### A. The Parties

OSA markets and sells horological products, including watches, clocks, and corresponding accessories.[3] The company holds registered trademarks for the name "Omega" and the letter "O" for use in connection with, among other things, watches, horological instruments, electronic time recording devices, and various parts and ac-

---

**1.** In support of their motion for summary judgment, defendants submitted a Local Rule 9(c)(1) statement containing 29 enumerated paragraphs. Plaintiff filed a corresponding Local Rule 9(c)(2) statement, setting forth defendants' 29 paragraphs and stating whether each was admitted or denied. However, plaintiff's 9(c)(2) statement failed to contravene properly defendant's 9(c)(1) statement by providing an annotated separate section listing each issue of material fact as to which plaintiff contends there is a genuine issue to be tried. Rather, plaintiff's 9(c)(2) statement included an enumerated list entitled "Material Facts Refuting Defendants' Statement" complete with annotations citing deposition testimony and defendants' admissions. "One important purpose of Local Rule 9(c) is to direct the court to the material facts that the movant claims are undisputed and that the party opposing the motion claims are disputed. Otherwise the court is left to dig through a voluminous record, searching for material issues of fact without the aid of the parties." *N.S. v. Stratford Bd. of Educ.*, 97

F.Supp.2d. 224, 227 (D.Conn.2000); accord *Hill v. Meta Group*, 62 F.Supp.2d. 639, 639 (D.Conn.1999).

Although plaintiff's 9(c)(2) statement is not strictly in conformance with the rules, plaintiff's annotated briefs submitted in connection with the parties' cross motions do direct the Court to parts of the record purportedly contravening the facts set forth in defendant's 9(c)(1) statement. Accordingly, the Court will deem admitted by rule 9(c)(1) only facts not controverted by either evidentiary citations found in plaintiff's 9(c)(2) statement or plaintiff's briefs.

**2.** The Court will set forth additional facts contained in the record as needed for its analysis of the parties' cross-motions.

**3.** Defendants' Memorandum in Support of Summary Judgment Appendix I (Deposition of Christine S. Rupp 54:4–56:17) and Appendix II (Deposition of Hanspeter Rentsch 114:24–115:19).

cessories related to watches.[4]

OE is a Delaware corporation with its principal place of business in Stamford, Connecticut.[5] OE specializes in marketing industrial and scientific products used for, among other things, the control or measurement of temperature, humidity, pressure, strain, force, flow, level, pH, and conductivity.[6] OE holds at least one registered trademark for the name "Omega" for use in connection with scientific and industrial apparatus.[7]

OP is an affiliate of OE, which operates as OE's trade vehicle for selling technical books, software and other printed material.[8] OP is the registered owner of the domain name OMEGAWATCH.com.[9]

OS is an affiliate of OE, which operates as a trade vehicle for the sale of scientific and technical instruments.[10] OS is the registered owner of the domain name OMEGATIME.com.[11]

### B. The Parties' Prior Disputes

Throughout the 1980s, OE and OSA had a history of disputing the scope of their respective trademark rights. During that period, the two parties signed several agreements limited to certain countries and trademark registrations. In an effort to end such disputes once and for all, in 1992, OE entered into a worldwide agreement with OSA. In 1994, the agreement was replaced by a new worldwide agreement, which was executed for and on behalf of OSA on May 3, 1994, and OE on August 2, 1994 ("1994 Agreement").[12]

The 1994 Agreement states, in part, that

both parties hereto are desirous of coming to an arrangement for the avoidance of future interference Worldwide between their respective fields of commercial operation under their Rights in respect of Trademarks consisting of or including the word OMEGA and/or the Greek letter O or containing elements colourably resembling either of thos[e] two elements.[13]

The 1994 Agreement settled various contested matters around the world involving OE's and OSA's trademarks. Among other things, OE agreed to withdraw certain oppositions against OSA and amend certain definitions of goods in OE's trademark applications and OSA agreed to amend certain definitions of goods in OSA's trademark applications.[14]

4. U.S. Trademark Registrations 577,415, 660,541, 1,290,661, 566,370, 25,036, 578,041, and 708,731.

5. OSA's Complaint ¶ 2 and OE's Amended Answer ¶ 2.

6. Plaintiff's Opposition to Summary Judgment at 6.

7. U.S. Trademark Registration 818,251; Declaration of Christine B. Riggs ¶ 3 and Exhibit M. Plaintiff's 9(c)(2) Statement ¶ 6 denies that defendant's trademark is valid, subsisting, existing and incontestable. However, defendants' evidence irrefutably confirms the validity and incontestable status of their trademark, and, as required, plaintiff has directed the Court to no controverting evidence. *See infra* at pp. 12–15 and note 33.

8. Plaintiff's Complaint ¶ 5; Plaintiff's Opposition to Summary Judgment at 6; Plaintiff's 9(c)(1) Statement ¶ 2.

9. Defendants' 9(c)(2) Statement ¶ 4.

10. Plaintiff's Complaint ¶ 5; Plaintiff's Opposition to Summary Judgment at 6; Plaintiff's 9(c)(1) Statement ¶ 3.

11. Defendants' 9(c)(2) Statement ¶ 5.

12. Plaintiff's 9(c)(2) Statement ¶ 18.

13. Plaintiff's 9(c)(2) Statement ¶ 19.

14. *Id.*

Relevant to the present cross motions, the 1994 Agreement also contains the following provisions:

Henceforth from the signing of this Agreement and effective in all countries of the World:

a. Omega Engineering Incorporated undertakes not to use, register or apply to register any trademark consisting of or containing the word Omega or the Greek letter O or any mark containing elements colourably resembling either of those two elements in respect of computer controlled measuring, timing and display apparatus, unless intended for science or industry.[15]

### C. The Present Dispute

Because the disposition of the parties' motions turns largely on the intent underlying OP's and OS's registration and use of OMEGAWATCH.com and OMEGA-TIME.com domain names, defendants' explanation of their general marketing strategy and the resulting registration and use of the offending domain names is here set out in detail: [16]

Since [the early 1990s], OE has employed a strategy of registering a variety of OMEGA domain names for marketing and defensive purposes. Although Omega Engineering uses the domain name omega.com as the primary name for entry to its Internet website, OE has also registered and uses other domain names for its marketing purposes. For example, OE uses particular domain names in advertisements to permit potential customers to access directly the web pages for products in which they have an interest, instead of forcing them to navigate from the main entrance to its Internet website.

OE has also used specific domain names to track the effectiveness of its marketing by advertising in different trade journals different domain names, all leading to the same web page for a particular product. By tracking the number of sessions and time spent for each domain name, it can determine which trade journal generated more requests to view the product.

From a marketing point of view, by having a large collection of OMEGA domain names, OE and its affiliates maximize the chance that a customer looking for a particular product, product type or product manual or based on an advertised feature or slogan, will be led to OE's main web page or a particular product page, a particular product manual or specific technical data on a subject, even if the customer does not initially type in omega.com.

In late 1995 and early 1996, OP and OS created advertising campaigns with associated domain names. An advertising campaign was created for technical and scientific books sold under the OP name utilizing the slogan "Watchword on Scientific and Technical Books." Web pages for an Internet website featuring this advertising campaign were created, using the domain name omega-watch.com, which is a combination of the OMEGA trademark and a shortened version of the slogan "Watchword on Scientific and Technical Books."

---

**15.** Plaintiff's 9(c)(2) Statement ¶ 20..

**16.** The Court understands ¶¶ 9 and 10 of Plaintiff's 9(c)(1) Statement as an admission to the existence of defendants' explanation and not to its veracity. Only reading those paragraphs woodenly and in isolation from the rest of plaintiff's submissions could lead to the conclusion that plaintiff has "conceded itself out of court." Defendants' Motion for Summary Judgment at 5–6.

OP registered the domain name OME-GAWATCH.com on or about December 15, 1995, and began using the domain name in approximately May, 1996. The site initially consisted of the slogan "Watchword on Scientific and Technical Books," plus a listing of publications that were available from Omega Press.

At about the same time, in 1995–96, another advertising campaign was developed for the scientific instruments OS sold using the slogan "Timely Introducing Scientific Instruments." Web pages for an Internet website featuring this advertising campaign were also created using the domain name omegatime.com, which is a combination of the Omega trademark and a shortened version of the advertising slogan "Timely Introducing Scientific Instruments."

Omega Scientific registered the domain name OMEGATIME.com on December 15, 1995, and began using the domain name in approximately May, 1996. As originally formulated, the site contained the slogan "Timely Introducing Scientific Instruments" and a listing of scientific instruments available for purchase from Omega Scientific or Omega Engineering.[17]

On May 28, 1996, Jess M. Collen, counsel of record for OSA in the present suit, wrote Dr. William Drucker, who was apparently at that time outside counsel for OE, requesting an "immediate transfer of the rights to [OMEGAWATCH.com and OMEGATIME.com] to OSA."[18] Attorney Collen further wrote, "Had not your client already identified its desire to bring about an immediate fully satisfactory conclusion to this dispute . . . we would by now have taken legal steps."[19]

Sometime after July 17, 1998, defendants replaced the content of the websites located at OMEGAWATCH.com and OMEGATIME.com with the following hyperlinks and corresponding notations:[20]

If you want to buy a wristwatch, clock, or want to time a sporting event, please contact:

*http://www.omega.ch*[21]

If you are looking for Omega Engineering, Inc., world leader in process measurement and control instruments, please contact:

*http://www.omega.com*

Defendants explain:

More recently, the domain sites omegatime.com and omegawatch.com have provided links to the omega.com website where all of the products and merchandise of Omega Engineering and its affiliates are listed for sale. . . . This approach is consistent with the marketing strategy, described above, of using multiple domain names and websites as multiple ports of entry to a main website or to pages within the main website.

Thus, defendants have continued to utilize the domain name omegatime.com as a marketing vehicle to attract customers looking for computerized timing devices and to direct them to the omega.com website where such products are sold.

**17.** Defendants' 9(c)(1) Statement ¶¶ s. 13–15; *See* Declaration of Dr. Milton B. Hollander ("Hollander Declaration") ¶¶ s. 9–11.

**18.** Hollander Declaration Exhibit J (Letter of Jess Collen to William Drucker).

**19.** *Id.*

**20.** Plaintiff's Opposition to Summary Judgment at 10–11 and Exhibit B; Plaintiff's 9(c)(2) Statement ¶ 24.

**21.** Omega.ch is OSA's main website.

The defendants have also continued to use the omegawatch.com domain name to attract customers familiar with the slogan "Watchword on Scientific and Technical Books" and as a defensive tactic to protect against encroachment on the Omega name on the Web.[22]

Finally, defendants have not offered to sell OMEGAWATCH.com or OMEGA-TIME.com to plaintiff or any third party for monetary or other remuneration.[23]

## III. Legal Standard for Summary Judgment

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue of fact is "material" for these purposes if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Accordingly, summary judgment may be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Procedurally, Rule 56 places the initial burden of production of evidence on the party moving for summary judgment to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once that burden is met, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(c) and (e)).

"A District Court must resolve any factual issues of controversy in favor of the non-moving party," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), mindful that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. On the other hand, the object of Rule 56(e) "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit," *Lujan*, 497 U.S. at 888, 110 S.Ct. 3177, and therefore the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. A "mere scintilla" of evidence is not enough to defeat summary judgment, *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; "[i]f the evidence is merely colorable...or is not significantly probative...summary judgment may be granted." *Id.* at 250, 106 S.Ct. 2505 (citations omitted).

---

**22.** Plaintiff's 9(c)(2) Statement ¶ 17; *See* Hollander Declaration ¶ 13. As noted above, *see supra* at note 16, it is the fact of this explanation, and not its accuracy, that is undisputed.

**23.** Plaintiff's 9(c)(2) Statement ¶ 26; *See* Hollander Declaration ¶ 22. Plaintiff denies the part of this fact that relates to third parties. However, as plaintiff neither points to nor offers any controverting evidence, the Court accepts defendants' entire factual assertion as true.

The District Court then determines whether to grant summary judgment, with the understanding that "[t]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party...." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). Stated differently, the District Court's ultimate concern at the summary judgment stage is "whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505.

Finally, summary judgment "is properly regarded not as a disfavored procedural shortcut," *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548, and, applying the Supreme Court's framework in the context of the now less than three year old ACPA, district courts have granted and courts of appeal affirmed summary judgment against cybersquatters and in favor of trademark owners. *See e.g., Virtual Works, Inc. v. Volkswagen of Am., Inc.,* 238 F.3d 264 (4th Cir.2001); *People for the Ethical Treatment of Animals v. Doughney,* 263 F.3d 359 (4th Cir.2001); *Domain Name Clearing Co. v. F.C.F. Inc.,* 16 Fed. Appx. 108, 2001 WL 788975 (4th Cir.2001) (unpublished disposition subject to Fourth Circuit Rule 36(c)); *Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft,* 213 F.Supp.2d 612 (E.D.Va.2002); *Int'l Bancorp, L.L.C. v. Societe Des Baines De Mer Et Du Cercle Des Etrangers A Monaco,* 192 F.Supp.2d 467 (E.D.Va.2002); *Cable News Network L.P. v. CNNEWS.com,* 177 F.Supp.2d 506 (E.D.Va.2001); *Victoria's Cyber Secret Ltd. P'ship. v. V Secret Catalogue, Inc.,* 161 F.Supp.2d 1339 (S.D.Fla.2001); and *Mattel, Inc. v. Adventure Apparel,* No. 00 CIV. 4085, 2001 WL 1035140 (S.D.N.Y. Sept. 7, 2001).

## IV. Discussion

### A. Evidentiary Challenges

Both plaintiff and defendants have made numerous evidentiary challenges to each other's submissions supporting each side's summary judgment motion. The Court's ultimate disposition of the parties' cross motions moots most of these challenges. However, the Court will separately address defendants' challenge to the sufficiency of plaintiff's proffered evidence regarding its registered trademarks because of the centrality of that evidence to resolution of plaintiff's motion.

Plaintiff asserts that it has all right, title, and interest in and to seven United States registered trademarks for the marks "Omega" and/or "O" for, among other things, watches and horological instruments. In support, plaintiff provided the Court at oral argument with seven original updated trademark registrations, including Trademark Registration Nos. 566,370, 708,731, and 1,290,661, replacing older copies which had been submitted as Exhibit 1 to Plaintiff's Complaint.

Number 566,370 is for the mark "Omega," reveals the registrant as OSA with a renewal term of ten years from November 4, 1992, is stamped "Section 8 & 15," is stamped with the seal of the United States Patent and Trademark Office, is certified as a true copy, and is signed by a certifying officer with authority from the commissioner of patents and trademarks. Numbers 578,041 and 1,290,661 are exactly the same except that both are for the mark "O" over the word "Omega", No. 578,041 has a renewal term of ten years from July 28, 1993, and No. 1,290,661 has a renewal term of twenty years from August 21, 1984.

On their face, the trademark registrations reflect that OSA has adopted and is

using the trademarks for, among other things, watches (including pocket watches, wrist watches (with or without straps, bands or bracelets), pendant watches, calendar watches, and stop-watches), clocks, and computer apparatus for checking and controlling the measurement of time and distance for sporting events.

Defendants argue that plaintiff's registered trademarks are inadmissible because trademark registrations appended to an unverified complaint do not constitute admissible evidence that OSA, in fact, owns the registrations or that the registrations are valid and subsisting. At oral argument, defendants did not comment on plaintiff's offer of the updated registrations.

■ Pursuant to 15 U.S.C. § 1057(c),[24] plaintiff's registration certificates constitute prima facie evidence of the validity and registration of OSA's "Omega" and "O" marks, OSA's ownership of them, and OSA's exclusive right to use the registered marks in connection with the products mentioned therein. Moreover, the stamp "Section 8 & 15" on Trademark Registrations Nos. 566,370, Nos. 578,041, and 1,290,661, reveals that OSA's right to use the marks displayed in those registrations has been rendered incontestable by an affidavit properly filed pursuant to 15 U.S.C. § 1065. *See* Trademark Manual of Examining Procedure § 1604 (2d ed.) ("When [such] affidavits do comply with

statutory requirements, the copies of the registration are ... stamped ["Sec. 15 Affidavit Received"]");[25] *see also* Trademark Manual of Examining Procedure § 1605.04 (3d ed.); *Chrysler Corporation v. Vanzant,* 124 F.3d 210, 1997 WL 547993, at *1 n. 1 (9th Cir.1997) (unpublished opinion subject to Ninth Circuit Rule 36–3).

■ Finally, plaintiff's copies of trademark registrations are admissible evidence under Fed.R.Evid. 201(b)(2) as a "judicially noticed fact ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b)(2); *see Metro Publ'g, Ltd. v. San Jose Mercury News,* 987 F.2d 637, 641 n. 3 (9th Cir. 1993), *abrogation on other grounds recognized by Roe v. Anderson,* 134 F.3d 1400 (9th Cir.1998) ("Certified copies of trademark registrations from the principal register fall within [Fed.R.Evid. 201(b)(2) ]").[26] Accordingly, plaintiff's trademark registration certificates will be considered under Rule 56(e).

## B. ACPA

Congress enacted the ACPA on November 29, 1999, to "protect consumers and American businesses, to promote the growth of online commerce, and to provide clarity in the law for trademark owners by prohibiting bad-faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from

**24.** In pertinent part, 15 U.S.C. § 1057(c) reads,

> [A] certificate of registration of a mark upon the principal register ... shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate....

**25.** The "Section 15" refers to section 15 of the Lanham Trademark Act of July 5, 1946, codified at 15 U.S.C. § 1065.

**26.** The Court also notes that, under Fed. R.Evid. 902(1), all seven trademark registrations submitted by plaintiff at oral argument are self-authenticating as "document[s] bearing a seal purporting to be that of the United States ... or a ... department ... or agency thereof, and a signature purporting to be an attestation...."

the goodwill associated with such marks." *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 495 (2d Cir.2000) (*quoting* S.Rep. No. 106–140, at 4 (1999)). In pertinent part, the ACPA provides,

A person shall be liable in a civil action by the owner of a mark...if, without regard to the goods and services of the parties, that person

(i) has a bad faith intent to profit from that mark...; and

(ii) registers, traffics in, or uses a domain name that-

(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

(II) in the case of a famous mark that is famous at the time of the registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or ...

15 U.S.C. § 1125(d).

The Second Circuit's sole decision on the ACPA utilized a three part analysis for determining a violation of the statute, which asks sequentially: 1) whether a mark is distinctive or famous; 2) whether a domain name is identical or confusingly similar to that mark (or additionally, in the case of a famous mark, whether a domain names is dilutive of that mark); and 3) whether that domain name was registered, trafficked in, or used with a bad faith intent to profit from that mark. *See Sporty's Farm*, 202 F.3d at 497–98; *see also Newport Electronics, Inc. v. Newport Corp.*, 157 F.Supp.2d. 202, 214 (D.Conn. 2001). Therefore, the elements of an ACPA claim permit a plaintiff to pursue three separate tracks of liability: 1) Distinctiveness, Identical or Confusingly Similar, and Bad Faith; 2) Famous, Identical or Confusingly Similar, and Bad Faith; and 3) Famous, Dilutive, and Bad Faith.

Plaintiff argues that it has met its summary judgment burden on all three tracks, whereas defendants seek summary judgment on the grounds that no reasonable jury could find for plaintiff on the issue of bad faith, or, in the alternative, that plaintiff's claim under the ACPA is time barred by the applicable statute of limitations and/or laches.

## 1. Distinctive or Famous

Plaintiff proceeds on the alternative theories that its marks "Omega" and "O" are both distinctive and famous. Because defendants did not move for summary judgment on the basis of either alternative element, the Court need only address at this point whether plaintiff has demonstrated that there is no genuine issue of material fact with respect to whether its marks are distinctive and/or famous.

### a.) Distinctiveness of Plaintiff's Marks

For purposes of the ACPA,

[D]istinctiveness refers to inherent qualities of a mark and is a completely different concept from fame. A mark may be distinctive before it has been used— when its fame is nonexistent. By the same token, even a famous mark may be so ordinary, or descriptive as to be notable for its lack of distinctiveness.

*Sporty's Farm*, 202 F.3d at 497.

In the Second Circuit, the inherent distinctiveness of a trademark is traditionally evaluated by the test promulgated by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976), pursuant to which marks are classified as either (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful. *See Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1007 (2d Cir.1995).

At the low end are generic words—words that name the species or object to which the mark applies. These are totally without distinctiveness and are ineligible for protection as marks because to give them protection would be to deprive customers of the right to refer to their products by name....

One rung up the ladder are 'descriptive marks—those that *describe* the product or its attributes or claims. These also have little distinctiveness and accordingly are ineligible for protection unless they have acquired 'secondary meaning'...

The next higher rung belongs to 'suggestive marks'; these fall in an in-between category... They do not name or describe the product for which they are used, but they suggest the qualities or claims of that product. They are more distinctive than descriptive marks, and thus are accorded trademark rights.... Nonetheless, because they seek to suggest qualities of the product, they possess a low level of distinctiveness...

A mark is arbitrary or fanciful if there is no logical relationship whatsoever between the mark and the product on which it is used. However, even within the category of arbitrary or fanciful marks, there is still a substantial range of distinctiveness. Some marks may qualify as arbitrary because they have no logical relationship to the product, but nonetheless have a low level of distinctiveness because they are common. The most distinctive are marks that are entirely the product of the imagination and evoke no associations with the human experience that relate intrinsically to the product.

*Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 215–16 (2d Cir.1999).

Only suggestive, arbitrary, or fanciful marks are considered inherently distinctive. *See Knitwaves*, 71 F.3d at 1007.[27]

Finally, a registered trademark rendered incontestable by virtue of an affidavit filed under 15 U.S.C. § 1065 entitles the subject mark to a presumption that it is inherently distinctive. *See Sporty's Farm*, 202 F.3d at 497 (*citing Equine Techs., Inc. v. Equitech., Inc.*, 68 F.3d 542, 545 (1st Cir.1995)).

■ Plaintiff argues that its "Omega" and "O" marks as used in connection with the sale and distribution of watches are inherently distinctive because they place at least at the suggestive level on the *Abercrombie* scale. In support, plaintiff cites the definition of "Omega" found in Merriam's Webster's Collegiate Online Dictionary:

(1) the 24th and last letter of the Greek Alphabet

(2) Last, Ending

(3) a: a negatively charged elementary particle that has a mass 3270 times the mass of an electron—called also *omega minus* b: a very short-lived unstable meson with mass 1532 times the mass of an electron—called also *omega meson*.

---

**27.** The Court notes that, although intimated to the contrary, *Sporty's Farm* did not explicitly decide whether a showing of acquired secondary meaning (acquired distinctiveness) versus inherent distinctiveness would satisfy the 'distinctive' element of the ACPA. *See Sporty's Farm*, 202 F.3d at 497 ("Distinctiveness refers to inherent qualities of a mark ... [E]ven a famous mark may be so ... descriptive as to be notable for its lack of distinctiveness."); *Cf. TCPIP Holding Co. v. Haar Communications, Inc.*, 244 F.3d 88, 98 (2d Cir. 2001) (holding that, for purposes of the Federal Trademark Dilution Act ("FTDA"), a mark must possess "a sufficient degree of 'inherent distinctiveness' to satisfy the Act's requirement of 'distinctive quality.'") Resolution of this issue is unnecessary for the disposition of the parties' cross motions.

Plaintiff points out that none of the dictionary definitions of "omega" are generic terms for watches, or describe a feature or attribute of watches, time, timekeepers, or timers. Defendants nonetheless urge that OSA has failed to meet its burden of establishing that there is no triable issue of fact with respect to distinctiveness. Most of defendants' arguments, however, address whether plaintiff's marks are famous.

The Court has no doubt that the marks "omega" and "O", as used in connection with the manufacture and sale of watches, clocks, and electronic timing equipment, are inherently distinctive. The meanings associated with the word "omega" and letter "O" do not suggest time or watches. Rather, "omega" and "O" are simply arbitrary designations for plaintiff's watches, corresponding accessories, and timing equipment. As such, the marks are distinctive within the meaning of the ACPA. As no rational trier of fact could return a verdict for defendants on this element, plaintiff is entitled to summary judgment that the marks "omega" and "O" are distinctive for purposes of the ACPA.

**b.) Fame of Plaintiff's Marks**

■ Whether a mark is famous within the meaning of the ACPA is measured by the "rigorous criteria" of 15 U.S.C. 1125(c)(1), a provision originally enacted in 1996 as part of the FTDA of 1995. *See Sporty's Farm*, 202 F.3d at 497 and n. 10. That statute reads in pertinent part,

In determining whether a mark is distinctive and famous, a court may consider factors such as, but not limited to -

(A) the degree of inherent or acquired distinctiveness of the mark;

(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

(C) the duration and extent of advertising and publicity of the mark;

(D) the geographical extent of the trading area in which the mark is used;

(E) the channels of trade for the goods and services with which the mark is used;

(F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;

(G) the nature and extent of use of the same or similar marks by third parties; and

(H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, on the principal register.

In construing the meaning of 'fame' under the FTDA, the Second Circuit has held,

Putting together the extraordinary power the Act confers on a 'famous' mark and the improbability that Congress intended to grant such outright exclusivity to marks that are famous in only a small area or segment of the nation, with the hints to be gleaned from the House Report [i.e. examples of famous marks are Dupont, Buick, and Kodak], we think Congress envisioned that marks would qualify as 'famous' only if they carried a substantial degree of fame.

*TCPIP*, 244 F.3d at 99.

In *TCPIP*, the district court's preliminary injunction was vacated in part because plaintiff's evidentiary submissions to the district court failed to demonstrate the degree of fame necessary under the statute. Although the plaintiff had provided affidavit testimony that its business had grown from $100 million in sales from 87 stores in 1994 to $280 million from 228 stores operating in 27 states in 1998, and

that it had expended tens of millions of dollars in advertising its mark over the previous . decade, the appellate court focused on the absence of consumer surveys, press accounts, or "other evidence of fame," the absence of any statistics pertaining to any year before 1994, and the unsubstantiated assertions that plaintiff had used the mark for thirty years. *See TCPIP*, 244 F.3d at 99–100; *see also Advantage Rent–A–Car, Inc. v. Enterprise Rent–A–Car, Co.*, 238 F.3d 378 (5th Cir. 2001) (affirming district court's determination that defendant's slogan "We'll Pick You Up" was not sufficiently famous for purposes of the FTDA even where defendant spent more than $130 million on advertising containing the slogan, and had used the slogan in all of the media forms in which it advertised, including commercials shown on prime time national television, major broadcast networks, and cable stations).

In *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868 (1999), a FTDA case, the Ninth Circuit not only reversed the district court's award of summary judgment in favor of plaintiff, the trademark owner, but also remanded the case with instructions to enter summary judgment for defendants on their cross motion, concluding that, among other elements, the owner had not created a genuine issue of fact on the marks' fame. While the appellate court agreed that plaintiff's evidence of extensive advertising and sales, international operations, consumer awareness, and the longstanding use of the trademarks "Avery" and "Dennison" satisfied the other statutory factors, failure to proffer evidence of "whether consumers in general have any brand association with 'Avery' and 'Avery Dennison'," [28] required the conclusion that plaintiff had failed to meet its burden in opposing summary judgment of showing a genuine issue of fact regarding its marks' fame. *Avery Dennison*, 189 F.3d at 878–79. "In the instant case . . . [defendant's] sought-after customer base is Internet users who desire vanity e-mail addresses, and Avery Dennison's customer base includes purchasers of office products and industrial fasteners. No evidence demonstrates that Avery Dennison possesses any degree of recognition among Internet users or that Appellants direct their e-mail services at Avery Dennison's customer base." *Id.* at 877–78.

Although OSA recognizes that a mark is considered famous for purposes of the ACPA under the criteria laid out in 15 U.S.C. 1125(c)1, it undertakes no analysis of that subsection's eight criteria. Plaintiff's submissions on fame consist of a portion of the deposition testimony of Christine Sauser Rupp, a lawyer for OSA's parent company,[29] and the declaration of plaintiff's counsel of record regarding the marketing and advertising literature currently available on plaintiff's website with more than one hundred pages of advertising material, including posters containing Omega advertisements from the last one hundred years, advertisements in foreign languages, advertisements featuring famous people such as Pierce Brosnan and Cindy Crawford, and advertisements informing browsers that Omega watches are not available for sale over the internet but only at one of the

---

**28.** Although the court stated that "proper consumer surveys might be highly relevant to a showing of fame," it found those offered as evidence by Avery Dennison to prove only that consumers "already acquainted with Avery and Avery Dennison products are famil-iar with Avery Dennison." *Avery Dennison*, 189 F.3d at 879.

**29.** Plaintiff's 9(c)(1) Statement Exhibit P (Deposition of Christine S. Rupp).

company's worldwide retail locations.[30] Reviewing income statements, Ms. Rupp testified in her deposition that OSA had "sales and advertising expenditures for the Omega brand of watches and timepieces ... in the hundreds of millions of dollars."[31]

As an initial matter, defendants dispute whether plaintiff's proffered evidence is admissible. In the alternative, defendants argue that, even if such evidence were admissible, it would not establish the absence of genuine issue of fact as to the statutory element of fame because plaintiff fails to submit any evidence of consumer recognition of its mark, including surveys or other market research, and because of defendants' own widespread and long-standing use of the Omega mark.

The Court agrees with defendants' alternative argument, and thus does not address the admissibility of plaintiff's proffered evidence. Accepting plaintiff's representations, plaintiff's evidence could satisfy factors (A)-(C), (H), and possibly even (D) of 15 U.S.C. § 1125(c)(1), namely, that the registered trademarks "Omega" and "O" have been used for an extended period of time in connection with the sale of watches, have had millions of dollars in advertising spent on them (since 1989), customers in the United States have purchased millions of dollars worth of Omega brand watches, and (as discussed above) the marks are both distinctive and on the principal register.

However, plaintiff has offered no evidence on what appears to be the most important factor in the analysis, 15 U.S.C. § 1125(c)(1)(F), the degree of recognition of plaintiff's marks (as related to watches etc.) in the trading areas and channels of trade used by both OSA and defendants, namely the wristwatch niche market in retail stores and the market for scientific and industrial instruments on internet sales sites. *See Sporty's Farm,* 202 F.3d at 497 n. 10;[32] *TCPIP,* 244 F.3d at 99–100; *Avery Dennison,* 189 F.3d at 878–80. Plaintiff offers no consumer surveys or other evidence of fame among consumers in general.

Moreover, defendants have offered affirmative evidence on factor (G) under 15 U.S.C. § 1125(c)(1), the nature and extent of the use of the Omega mark by OE. Exhibit M to the Declaration of B. Christine Riggs ("Riggs Declaration"), in house counsel to OE, establishes that OE owns a valid, subsisting, incontestable registered trademark for "Omega" in connection with temperature measurement products.[33]

Accordingly, plaintiff has not met its burden on summary judgment to establish the absence of a genuine issue of material fact regarding whether or not the "Omega" or "O" marks are famous within the

---

30. Declaration of James R. Hastings.

31. Plaintiff's 9(c)(1) Statement ¶ 24 and Exhibit P (Deposition of Christine S. Rupp 194:14–198:15 and Exhibit 116). The Court notes that the income statements attached to the submitted portion of Ms. Rupp's deposition testimony provide data only for the period from 1989 to 2000, and apparently pertain only to the United States.

32. While *Sporty's Farm* did not decide whether the mark at issue in the case was "famous" for ACPA purposes, it suggested that absence of evidence of factor (F) could defeat a claim of fame. *See Sporty's Farm,* 202 F.3d at 497 and n. 10.

33. Exhibit M contains Trademark Registration No. 818,251 for the mark "Omega", which reveals the registrant as OE and a renewal term of twenty years from November 8, 1986, is stamped "Comb. Aff. Sec. 8 & 15," is stamped with the seal of the United States Patent and Trademark Office, is certified as a true copy, and is signed by the commissioner of patents and trademarks.

meaning of the ACPA.[34] Because plaintiff has failed to meet its burden with respect to fame, the Court does not address plaintiff's companion contention that the domain names at issue dilute its famous marks.[35] However, inasmuch as the Court has found distinctiveness of plaintiff's mark, it proceeds to the next inquiry on plaintiff's ACPA claim.

## 2. Identical or Confusingly Similar

■■■ The next question is whether there is a triable issue as to whether defendants' registered domain names, OMEGAWATCH.com and OMEGATIME.com, are "identical or confusingly similar" to plaintiff's marks "Omega" and "O".[36] Defendants do not predicate their motion for summary judgment on this issue, and therefore, the Court considers only whether plaintiff has met its burden of establishing that no reasonable jury could conclude that the domain names are not confusingly similar to plaintiff's marks.

34. Because defendants' summary judgment motion does not attempt to negate or point to the absence of evidence on the element of fame, the Court does not decide whether summary judgment in favor of defendants on this alternative liability path would be appropriate.

35. For purposes of the FTDA, "dilut[ion]" is defined in 15 U.S.C. § 1127, and is thoroughly discussed in *Nabisco,* 191 F.3d at 216–25.

36. When evaluating whether a domain name is confusingly similar to a trademark, a district court disregards the top-level domain name (e.g. ".com", ".org", ".net" etc.). *See Sporty's Farm,* 202 F.3d at 497–98.

37. The ACPA's legislative history further corroborates the deduction, stating that Congress sought to stop "individuals seeking extortionate profits by reserving Internet domain names that are similar or identical to trademarked names with no intention of using the names in commerce." H.R. Rep. 106–412, at 6 (1999).

Because it is clear that neither "OMEGAWATCH" nor "OMEGATIME" is identical to "Omega" or "O", the Court first must determine the definition of "confusingly similar" within the meaning of the ACPA. The Court begins by noting that, for purposes of a claim made under the ACPA, " '[c]onfusingly similar' is a different standard from the 'likelihood of confusion' standard for trademark infringement adopted ... in *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492 (2d Cir.1961)." *Sporty's Farm,* 202 F.3d at 498 n. 11 (*citing Wella Corp. v. Wella Graphics, Inc.,* 37 F.3d 46, 48 (2d Cir.1994)).

*Sporty's Farm,* with supporting citation to *Wella Corp., see Sporty's Farm,* 202 F.3d at 498 n. 11, distinguishes between the *Polaroid* test, under which a court examines likelihood of confusion by reference to the respective products of the parties; and the ACPA, which directs that whether a domain name is confusingly similar to a trademark is to be evaluated "without regard to the goods or services of the parties." 15 U.S.C. § 1125(d)(1)(A).[37]

In *Wella Corp. v. Wella Graphics, Inc.,* 37 F.3d 46 (2d Cir.1994), the Second Circuit interpreted the phrase "confusingly similar" in an injunction following entry of default judgment of trademark infringement: "When enforcing injunctions that enjoin the use of any mark confusingly similar to the protected mark, courts should not adjudicate issues such as product proximity but should simply evaluate whether or not the new mark is confusingly similar to the protected mark, regardless of the products on which the marks are used." *Id.* at 48. "The district court should simply have determined whether "Wello" is confusingly similar to "Wella." " *Id.* On remand, the district court "look[ed] solely at the marks themselves, without regard to factors such as similarity of the parties' products or potential for customer confusion," and concluded that the new mark "Wello" was confusingly similar to "Wella". *Wella Corp. v. Wella Graphics, Inc.,* 874 F.Supp. 54, 56 (E.D.N.Y.1994).

The Second Circuit concluded without hesitation that "sportys.com" was confusingly similar to "sporty's" under the ACPA. *See Sporty's Farm,* 202 F.3d at 498.

Accordingly, the Court examines the plaintiff's record to determine whether defendants' domain names OMEGAWATCH and OMEGATIME are "confusingly similar" to plaintiff's trademarked "Omega" or "O" within the meaning of the ACPA by comparing solely plaintiff's marks and defendants' domain names, including their intrinsic sound, sight, and meaning, without reference to goods or services with which the domain name is associated by the parties' use. *See also N. Light Tech. Inc. v. N. Lights Club,* 97 F.Supp.2d. 96, 117–18 (D.Mass.2000), *affd.* 236 F.3d 57 (1st Cir.2001); J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25:78(4th ed. 2002) ("In the cybersquatting context, "confusingly similar" must simply mean that the plaintiff's mark and the defendant's domain name are so similar in sight, sound, or meaning that they could be confused."). It is apparent that this inquiry differs somewhat from that in *Sporty's Farm,* where the analysis centered on the similarity between two virtually identical words save for an apostrophe, and not, as in the present case, on the similarity of one word with its identical twin augmented by a generic term.

Plaintiff submits no evidence on "confusingly similar," but states the obvious fact that both OMEGAWATCH and OMEGATIME incorporate the mark "omega" plus one of two generic words, "time" or "watch". In response, defendants point to the absence of affidavit or deposition testimony of any actual or potential viewer regarding any alleged confusing similarity, and/or survey or market research establishing confusion between the two domain names and the mark "omega".

Restricting the analysis to an evaluation of the sight, sound, and meaning of the mark and domain names themselves, and without reference to the items, products, or services on which they are used, the Court concludes, under the principles of *Sporty's* and *Wella,* that the domain names "OMEGATIME" and "OMEGAWATCH" are confusingly similar to the marks "omega" or "O". Although this is not a case where the domain names at issue are identical to a distinctive mark save for a misplaced or substituted letter, capitalization, or the absence of an apostrophe, the names bear such a visual resemblance that internet users would reasonably assume that the names were modified, used, approved, and/or permitted by OSA. As no reasonable jury could find for defendants on this element, plaintiff is entitled to summary judgment on the issue of "confusingly similar".

Even if the pool of names and marks that qualify as "confusingly similar" is somewhat enlarged by this conclusion that the "confusingly similar" analysis can be applied to domain names consisting of another's mark coupled with a generic word or term, a contrary result would directly contravene Congressional intent in enacting the ACPA and would permit a cybersquatter to evade the scope of the statute merely by adding to a distinctive or famous mark a generic term or word that has no connection to the goods or services attached to that mark by its owner. For example, a cybersquatter who sells motorcycles on a newly registered website such as dupontmotorcycles.com should not escape liability under the ACPA (assuming sufficient evidence of bad faith and mark fame or distinctiveness) by arguing that the domain name is not confusingly similar to the DUPONT mark on the grounds that the manufacture of chemicals has nothing

to do with the production of motorcycles.[38]

This conclusion is consistent with the other ACPA case law thus far. In *Prime Publishers, Inc. v. American–Republican, Inc.*, 160 F.Supp.2d. 266 (D.Conn.2001), the district court concluded after bench trial that ctvoices.com was confusingly similar to the mark "Voices", stating, "[w]e do not believe the Defendant's addition of a generic or geographic term such as "ct" is sufficient to distinguish the domain name from Plaintiff's protected mark. . . . An internet user might reasonably assume that "ct" was added to the Plaintiff's mark by the Plaintiff to identify its geographic location." *Prime Publishers*, 160 F.Supp.2d. at 280 (citation omitted).

In *Mattel, Inc. v. Internet Dimensions*, No. 99 CIV. 10066, 2000 WL 973745, at *3 (S.D.N.Y. July 13, 2000), also after bench trial, the court concluded that 'barbiesplaypen.com' was confusingly similar to the mark 'Barbie' because: "1) both contain the name 'barbie'; 2) the name 'Barbie' on the front page of the web site and the logo BARBIE both have approximately the same font, slant, size, etc.; 3) both BARBIE and 'barbiesplaypen.com' are inextricably associated with the verb 'play,' in the broad sense of the term." [39]

In *Harrods Ltd. v. Sixty Internet Domain Names*, 157 F.Supp.2d. 658, 677–78 (E.D.Va.2001), *affirmed in part, reversed in part* 302 F.3d 214 (4th Cir.2002), the district court, after bench trial, concluded that domain names such as harrodsbank,

harrodsbanking, harrodsstore, harrodsshopping, were confusingly similar to the HARRODS mark because they bore "a visual resemblance to the Harrods mark such that consumers might think that they were used, approved, or permitted by [the trademark owner]." *Id.* at 677. Elaborating, the district court observed,

> All eighteen second-level domain names at issue combine the distinctive HARRODS trademark with other generic or geographic terms in English and Spanish. ·[Defendant's] use of such qualifiers does not diminish the similarity of the defendant Domain Names to the HARRODS mark. . . . A visual comparison of each of the [domain names] with the HARRODS trademark leads to the indisputable conclusion that the [domain names] are confusingly similar to plaintiff's mark and a website user would reasonably assume that the qualifier added to the HARRODS mark was one added by Harrods Limited, the trademark holder.

*Id.* at 677–78 (citations and quotations omitted). The court "reinforce[d]" its conclusion by citing to a confirmatory survey conducted by plaintiff's expert. *Id.* at 678.

In *Ford Motor Co.*, 177 F.Supp.2d. at 641–42, Ford's allegations that domain names such as 4fordparts.com and 4fordtrucks.com were confusingly similar to the Ford mark were sufficient to overcome one group of defendants' Rule 12(b)(6) motion to dismiss. The court noted "courts con-

---

**38.** In this regard, the Court respectfully disagrees with the suggestion in *Ford Motor Co. v. Greatdomains.Com, Inc.*, 177 F.Supp.2d. 635, 642 n. 3 (E.D.Mich.2001) that "fordstheatre.org . . . incorporates the FORD mark with the addition of the generic word 'theatre' but, from its context, is not 'confusingly similar to' the FORD mark." That analysis under the ACPA is flawed because it improperly considers the "goods and services of the parties."

**39.** The Court notes that, in the second and third bases for finding confusing similarity, the district court moved beyond a comparison of the intrinsic sight, sound, and meaning of the name and the mark. The former considered the appearance of the mark as used in connection with its associated product and by the cybersquatter. The latter considered the "goods . . . of the parties" by imputing the concept of "play" to the mark.

sistently have found that 'slight differences' between domain names and registered marks, such as the addition of minor or generic words to the disputed domain names are irrelevant." *Id.* at 641 (*citing Victoria's Cyber Secret,* 161 F.Supp.2d. at 1351).[40]

### 3. Bad Faith Intent to Profit

The Court next addresses the issue of whether defendants acted with a "bad faith intent to profit" from plaintiff's marks "omega" and "O" in registering and using the domain names OMEGAWATCH.com and OMEGATIME.com. Both parties maintain that they have established in their favor that there is no genuine issue of material fact on this element.

The ACPA lists nine non-exclusive factors that "a court may consider" when determining whether a person has acted with a bad faith intent to profit:

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection(c)(1) of this section.

15 U.S.C. § 1125(d)(1)(B)(i).

The factors "reflect indicators that, in practice, commonly suggest bad-faith intent or a lack thereof in cybersquatting cases." Sen. Rep. No. 106–140, at 9 (1999); *see Sporty's Farm,* 202 F.3d at 499 n. 13 (" '[B]ad faith intent to profit' is a

---

**40.** The Court notes that the test for "confusingly similar" utilized in *Victoria's Cyber Secret* is similar to the Second Circuit's "likelihood of confusion" and not the standard for "confusingly similar" under the ACPA. *Sporty's Farm,* 202 F.3d at 498 n. 11.

term of art in the ACPA and hence should not necessarily be equated with 'bad faith' in other contexts.").

However, "the presence or absence of any of these factors may not be determinative," Sen. Rep. No. 106–140, at 9 (1999).[41] The Fourth Circuit has stated, "Because this evidence is so convincing, Factor (V) standing alone supports the district court's finding of bad faith intent on the part of Harrods BA." *Harrods*, 302 F.3d at 237. In its only analysis of the ACPA to date, the Second Circuit emphasized that "the most important grounds for [its] holding [of bad faith intent were] the unique circumstances of [the] case, which [did] not fit neatly into the specific factors enumerated by Congress but may nevertheless be considered under the statute." *Sporty's Farm*, 202 F.3d at 499.

■ Thus, in granting or affirming summary judgment in favor of a mark owner on a claim under the ACPA, district and circuit courts evaluate the cybersquatter's bad faith by reviewing the record evidence in light of both the statutory factors and the unique circumstances of each case. *See e.g., Virtual Works*, 238 F.3d at 268–270; *Doughney*, 263 F.3d at 368–69; *F.C.F.*, 16 Fed.Appx. 108, 2001 WL 788975 at *1–2 (Unpublished Disposition Subject to Fourth Circuit Rule 36(c)); *Eurotech*, 213 F.Supp.2d. at 623–27; *Societe*, 192 F.Supp.2d. at 484–487; *Cable News*, 177 F.Supp.2d. at 523–27; *Victoria's Cyber Secret*, 161 F.Supp.2d. at 1346–49; and *Mattel*, 2001 WL 1035140 at *3–6. Affidavit or declaration evidence is insufficient to survive summary judgment if it is merely colorable or not significantly probative. *See e.g., Mattel*, 2001 WL 1035140 at *4; *Victoria's Cyber Secret*, 161 F.Supp.2d. at 1348.

### a.) Analysis of Bad Faith: Introduction

■ As in *Newport Electronics*, "[t]he court notes at the outset that this is not the typical cybersquatting situation where a person registers a famous mark or name and then attempts to extort profits from the owner of the mark by selling the domain name.... Rather, this is a case where both parties possess [longstanding] trademark rights to some portion of the domain names in question." 157 F.Supp.2d. at 215–16.

The Fourth Circuit has provided a thorough and well reasoned bad faith analysis under the ACPA in a directly analogous situation,[42] from which this Court takes guidance on many of the issues in the present dispute.

As an initial matter,

The use of an identical mark by two different companies is sometimes allowed in trademark law under the concept of 'concurrent use'... the legisla-

---

**41.** Courts have granted summary judgment even where the mark owner only establishes some of the factors. *See also, Eurotech*, 213 F.Supp.2d. at 626 (summary judgment in favor of mark owner where only five of the nine ACPA statutory factors were clearly satisfied and the "big picture" was fully consistent with a finding of bad faith); *Cable News*, 177 F.Supp.2d. at 527 (same where only six of the nine statutory factors supported claim of bad faith); *Victoria's Cyber Secret*, 161 F.Supp.2d. at 1347–49 (same where only seven of the nine statutory factors weighed in favor of a finding of bad faith); *Mattel*, 2001 WL 1035140 at *3–5 (same where five factors favored a finding of bad faith and one other "tip[ped] slightly" in favor of trademark owner).

**42.** Although the *Harrods* decision is distinguishable from the present case in that the trademark rights of the parties there were limited to different geographical regions of the world, that distinction generally has no bearing on the application of the opinion's reasoning to this case.

tive history of the ACPA demonstrates that Congress recognized the legitimacy of concurrent use when it enacted the ACPA and did not intend to disrupt the rights of legitimate concurrent users of a mark...Accordingly, we should apply the bad faith factors in a manner that will not lead to a finding of bad faith registration every time a concurrent user registers a mark.

Of course, even recognizing the rights of concurrent users of a mark, a legitimate concurrent user still violates the other user's trademark rights if it uses the shared mark in a manner that would cause consumer confusion....

*Harrods*, 302 F.3d at 233 (citations omitted).

In support of its motion, plaintiff does not undertake a systematic analysis of the statutory factors. Plaintiff argues that the marshaled evidence overwhelmingly points to defendants' bad faith, and that defendants' rebuttal evidence and explanations for registration and use of the two domain names are nothing more than unsupported conclusory allegations concocted to survive summary judgment. Thus, plaintiff asserts that no reasonable jury could reach a conclusion other than bad faith and it is entitled to judgment as a matter of law.

Defendants not only disagree but contend that the record evidence generated by discovery, when measured against the non-exclusive bad faith statutory factors, clearly requires a grant of summary judgment in favor of them. Defendants further urge that, in addition to prevailing on

any analysis of the statutory factors, this case falls squarely within the ACPA's safe harbor provision.

After scrutiny of the record, the Court concludes that both parties' motions must be denied with respect to the issue of defendants' bad faith intent to profit under the ACPA and the determination properly left to a jury, mindful that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

**b.) Analysis of Bad Faith: Unique Circumstances**

Looming in the background of the facts giving rise to this case is the specter of at least fifteen years of strife, acrimony, and legal battle between the parties over each party's right to use the trademark "Omega" in their respective commercial spheres of operation.[43] The embodiment to the end of the strife, the "worldwide agreement" reached in 1992, quickly turned illusory as the parties returned to the table to work out and execute the 1994 Agreement.[44]

Then as now, plaintiff's business was the sale of watches and corresponding accessories.[45] Even so, less than two years after OE inked its name to the 1994 Agreement and having never sold watches under the mark "Omega",[46] OP and OS, OE's "affiliates" and "trade vehicles", sparked the

---

**43.** Plaintiff's 9(c)(2) Statement ¶¶ 18–22.

**44.** *Id.*

**45.** Defendants' Memorandum in Support of Summary Judgment Appendix I (Deposition of Christine S. Rupp 54:4–56:17) and Appendix II (Deposition of Hanspeter Rentsch 114:24–115:19); Plaintiff's 9(c)(1) Statement

Exhibit P (Deposition of Christine S. Rupp 196:6–198:10).

**46.** Defendants' 9(c)(2) Statement ¶¶ 8, 12, and 14 (Defendants do not offer and have not sold watches defined as "small, portable timepieces[s], especially ... worn on the wrist or carried in the pocket.").

present controversy when they registered and began to use OMEGAWATCH.com and OMEGATIME.com.[47]

On the OMEGAWATCH.com and OMEGATIME.com websites, defendants posted a combined total of four pages as seen in the exhibited printouts.[48] The three pages related to OMEGAWATCH.com were headed by the caption "OMEGA Press, Inc.", contained the slogan "Watchword on Scientific and Technical Books" positioned just underneath the company name, described and listed for sale scientific books such as "Temperature Measurement in Engineering" and "pH Measurements", and provided contact information for interested consumers.

The one page printout related to OMEGATIME.com was headed by the caption "OMEGA Scientific, Inc.", contained the slogan "Timely Introducing Scientific Instruments" positioned just beneath the company name, described and listed for sale five categories of scientific instruments (including "Tool Kits", "Test Instrumentation", "Handheld Instruments for Temperature", "Computer and Testing Accessories", and "Electronic Assembly Tools"), and provided contact information for interested consumers. Nowhere on the page were any sort of timing devices listed for sale.

Immediately after defendants' commencement of use of the sites, on May 28, 1996, plaintiff's counsel wrote defendants' outside counsel, warning of litigation if defendants did not transfer both domain names to plaintiff.[49]

In selecting OMEGAWATCH.com and OMEGATIME.com ostensibly for the promotion and furthering of their own enterprise, defendants added generic terms to their trademark (an abbreviated form of their business name) that exactly described their old adversary's primary product and that product's primary function,[50] but which bore no relationship whatsoever to either their own products or the products offered for sale on the newly registered websites. It would seem that the strong inference to be drawn from such evidence is that defendants acted in bad faith and not with a bona fide purpose of promoting their own business.[51]

**47.** *See* Hollander Declaration ¶¶ 5–6, 10–11, 14–18, and Exhibits D, E, F, I, and J. Exhibit E includes two internal memoranda, an e-mail dated December 14, 1995, and a handwritten letter dated May 22, 1996. The e-mail provides information for registering the offending domain names, including each one's corresponding slogan, and instructs on the timing of such registrations. The handwritten memorandum confirms that both sites had been "approved," would be "live immediately," and purports to have attached the printouts described in the following text, *see infra* at p. 39–40.

**48.** *See* Hollander Declaration Exhibits C, D, E, F, G, and H.

**49.** *See* Hollander Declaration ¶ 19 and Exhibit J.

**50.** The concept of time in modern society is inextricably intertwined with the watch. Watches keep "time", and people generally look to their watches to respond to the inquiry, "Do you have the time?"

**51.** In addition, as plaintiff stresses in its briefs, less than fourteen months prior to OE's affiliates' registration and use of OMEGAWATCH.com and OMEGATIME.com, defendant OE engaged in conduct that later became the basis for finding one of its subsidiary's, Sporty's Farm L.L.C., a cybersquatter:

In January 1996, nine months after registering sportys.com, OE formed another wholly-owned subsidiary [Sporty's Farm L.L.C.] ... and sold it the rights to sportys.com for $16,200...
It cannot be doubted, as the court found below, that OE registered sportys.com for the primary purpose of keeping Sportsman's from using that domain name. Several months later, and after this lawsuit was filed, OE created another company in an

In response, defendants explain that, in creating, registering, and using OME-GAWATCH.com and OMEGATIME.com, defendants were specifically implementing OE's general marketing strategy.[52] In brief, defendants maintain that, in accordance with their general marketing practices, they originally selected and registered the offending domain names in December of 1995 to feature advertising campaigns for the sale of scientific books and instruments, and then subsequently used the sites for that purpose until at least July 17, 1998.

Specific to the advertising campaigns, defendants claim that they derived the domain name OMEGAWATCH.com from a combination of defendants' trademark OMEGA plus the generic word "watch" as an abbreviation for the slogan "Watchword on Scientific and Technical Books;" and the domain name OMEGATIME.com from a combination of defendants' trademark OMEGA plus the generic word "time" as an abbreviation for the slogan "Timely Introducing Scientific Instruments". Sometime thereafter, still consistent with their marketing strategies, say defendants, they converted the websites into mere hyperlinks. In support of their explanation, defendants rely almost exclusively on the declaration testimony of Dr. Milton B. Hollander, director of OE, OP, and OS, and the attached four pages of printouts described above.[53]

Although plaintiff has pointed to both direct and circumstantial evidence of de-fendants' bad faith, including their seemingly illogical explanation of the derivation of the domain names from the subject slogans, domain names which bear no relationship to defendants' products or slogans, minimal evidence of any advertising campaigns, defendants' disputatious past with plaintiff, and prior engagement in activity proscribed by the ACPA, the credibility of defendants' explanation on this summary judgment record is more properly assessed by a jury, which could credit defendants' testimony and conclude that: 1) the disputatious past between the parties and the use of generic terms highly correlated with plaintiff's business bore only a spurious relationship to defendants' registration and use of OMEGA-WATCH.com and OMEGATIME.com; 2) although the words "watch" and "time" do not appear likely candidates for abbreviating respectively "Watchword on Scientific and Technical Books" and "Timely Introducing Scientific Instruments", the odd abbreviations derived, for example, from the belief that cumbersome adverbial endings such as -ly lack brevity desirable in business and the fact that OE was on the watch (or lookout) for what types of books might be appropriate for sale to the scientific community; 3) all external evidence of the advertising campaigns, in which the slogans and their corresponding domain names were associated, has in fact been lost in the sands of time; 4) the original printouts of the websites and two pages of internal memoranda remain the last and

unrelated business that received the name Sporty's Farm so that it could (1) use the sportys.com domain name in some commercial fashion, (2) keep the name away from Sportsman's, and (3) protect itself in the event that Sportsman's brought an infringement claim alleging that a 'likelihood of confusion' had been created by OE's version of cybersquatting.
*Sporty's Farm*, 202 F.3d at 494 and 499.

**52.** *See supra* at pp. 5–9.

**53.** *See supra* at pp. 5–9 and 39–40; Hollander Declaration Exhibits C, D, E, F, G, and H. Defendants also provided a second declaration of Dr. Hollander as Exhibit 4 to Defendants' Opposition to Summary Judgment ("Hollander Declaration II"), the testimonial contents of which do not differ significantly from the Hollander Declaration.

only evidence that some type of advertising campaign had at one time existed; and 5) the subsequent hyperlinks were in part an attempt to offer the proverbial olive branch to plaintiff—removing any real or imagined obstacle for customers seeking watches by pointing them to plaintiff's website—and not to disguise an otherwise illegitimate purpose in registering and using the offending domain names.

### c.) Analysis of Bad Faith: Statutory Factors

Factors (I),[54] (II),[55] and (VII) [56] weigh in favor of defendants because OE holds at least one longstanding and incontestable registered trademark for the mark "Omega",[57] OMEGAWATCH.com and OMEGATIME.com incorporate the "omega" portion of each defendant's legal name, and defendants accurately identified themselves as the registrants of OMEGA-WATCH.com and OMEGATIME.com and accurately stated their address and billing

and administrative contacts when they registered these domain names.[58]

Factor (III) [59] appears to weigh in favor of the conclusion that defendants acted in bad faith in registering and using OMEGAWATCH.com and OMEGATIME.com. Explaining Factor (III), Congress commented, "the legitimate use of the domain name in online commerce may be a good indicator of the intent of the person registering the name." S. Rep. 106–140, at 13 (1999); H.R. Rep. 106–412, at 11 (1999). Although defendants ostensibly offered goods at both OMEGAWATCH.com and OMEGATIME.com, on the evidence discussed above, they will likely have an uphill battle to persuade a jury that such offering was either "legitimate" or, in the language of the statute, "bona fide," and part of an "advertising campaign" to advance the offering of goods as opposed to an ad hoc creation to disguise illegitimate conduct directed against an adversary.

**54.** 15 U.S.C. § 1125(d)(1)(B)(i)(I)("the trademark or other intellectual property rights of the [alleged cybersquatter], if any, in the domain name.").

**55.** 15 U.S.C. § 1125(d)(1)(B)(i)(II)("the extent to which the domain name consists of the legal name of the [alleged cybersquatter] or a name that is otherwise commonly used to identify that person.").

**56.** 15 U.S.C. § 1125(d)(1)(B)(i)(VII)("the [alleged cybersquatter's] provision of material and misleading contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct.").

**57.** *See supra* at note 7, and p. 26 and note 33. Defendants also offer evidence of Benelux (Belgium, Netherlands, and Luxemborg) trademark registrations of "OMEGA-WATCH.COM" and "OMEGATIME.COM" owned respectively by OP and OS. *See* Riggs Declaration ¶¶ 7–8 and Exhibits Q and R. The

former is for paper, books, and generally other printed matter, and the latter for scientific apparatus, although not timers. Curiously, both were filed and registered on June 4, 1996, roughly six weeks subsequent to plaintiff's warning of litigation over the identical domain names. Although the fact of these registrations would appear to provide defendants with evidence of good faith under Factor (I), the substance and timing of these trademark registrations is suspicious. Defendants have merely trademarked the offending domain names for the general categories of products that first appeared on those pages. As set forth above, neither those products nor their allegedly accompanying slogans appear to bear any rational relationship to the generic portion of the domain names. Further, defendants made these foreign registrations in the face of possible litigation over identical subject matter.

**58.** Plaintiff's 9(c)(2) Statement ¶ 28.

**59.** 15 U.S.C. § 1125(d)(1)(B)(i)(III)("the [alleged cybersquatter's] prior use, if any, of the domain name in connection with the bona fide offering of any goods or services.").

On the present record, Factor (V)[60] does not tip decisively in favor of defendants or plaintiff. The factor focuses on confusion created in the first instance by a carefully selected domain name that, by virtue of its similarity to a mark or the products of a mark owner, results in the diversion of customers from the mark owner's online website. Thus, registration and use of domain names that are highly descriptive of goods offered by the mark owner but not offered by the alleged cybersquatter is significantly probative evidence of bad faith under this factor. *See Harrods*, 302 F.3d at 236.

Therefore, as set forth above, defendants' registration and use of domain names containing generic terms exactly describing plaintiff's principal product and its chief function but not descriptive of any product sold by defendants or offered at the offending websites constitutes strong evidence of defendants' intent to divert customers from plaintiff's online location by creating a likelihood of confusion.

However, more vexing is the part of Factor (V) requiring that the intent to divert be "for commercial gain." The original websites ostensibly offered products for sale, but defendants' replacement hyperlinks guided consumers where they wanted to go, that is, to defendants' websites or, under defendants' olive branch theory, to plaintiff's. On this record, a jury will have to decide whether it is persuaded by evidence that the hyperlinks were established in part to demonstrate defendants' good faith effort to resolve the dispute referenced in plaintiff's attorney's letter; or, among other possibilities, that defendants were really positioning themselves similarly to a retailer that strategically places particular items at the entrance to its store hoping to interest consumers who enter with the intent of purchasing other unrelated products—such that internet users seeking information on Omega watches will find the "world leader in process measurement and control instruments", and, if intrigued, click on omega.com and browse defendants' vast offering of scientific and industrial products. In other words, the jury will decide whether defendants' hyperlink demonstrates good faith or that defendants used the domain names to capture potential customers through illegitimate channels or for some other improper economic motivation.

Factor (VI)[61] favors defendants because it is undisputed that defendants have not offered to sell OMEGAWATCH.com or OMEGATIME.com to plaintiff or any third party for monetary or other remuneration.[62] Although defendant OE's conduct recorded in *Sporty's Farm* does constitute the type of activity described in this factor, one instance of such conduct would not fit within the statutory word "pattern."

Factors (VIII)[63] and (IX)[64], while nominally in favor of plaintiff, really play no

---

**60.** 15 U.S.C. § 1125(d)(1)(B)(i)(V)("the [alleged cybersquatter's] intent to divert customers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site.").

**61.** 15 U.S.C. § 1125(d)(1)(B)(i)(VI)("the [alleged cybersquatter's] offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having the intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct.").

**62.** Plaintiff's 9(c)(2) Statement ¶ 26.

**63.** 15 U.S.C. § 1125(d)(1)(B)(i)(VIII)("the [alleged cybersquatter's] registration or acquisition of multiple domain names which the

part in an ACPA analysis when both parties, as here, have trademark rights to some portion of the offending domain names. Regarding the application of Factor (VIII) in the concurrent user context, the Fourth Circuit stated,

> This factor was intended by Congress to target the 'practice known as warehousing, in which a cyberpirate registers multiple domain names—sometimes hundreds, even thousands—that mirror the trademarks of others...'While registration of multiple domain names is a factor that a court may consider in determining bad faith, Congress warned that the ACPA 'does not suggest that the mere registration of multiple domain names is an indication of bad faith' ... This is presumably because many companies legitimately register many, even hundreds, of domain names consisting of various permutations of their own trademarks in combination with other words. 'Just as they can have several telephone numbers, companies can register multiple domain names in order to maximize the chances that customers will find their web site.'
>
> ...Factor(VIII) will be triggered whenever there are concurrent users of a trademark...In the case of legitimate concurrent users, Factor (VIII) does not reliably indicate anything about the bad faith (or lack thereof) of the domain name registrant. Thus, standing alone,

person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names...without regard to the goods or services of the parties.").

64. 15 U.S.C. § 1125(d)(1)(B)(i)(IX)("the extent to which the mark incorporated in the [alleged cybersquatter's] domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section.").

65. Defendants' 9(c)(2) Statement ¶ 17.

the fact that a company named Harrods of Buenos Aires with trademark rights in the name 'Harrods' registers hundreds of Harrods-related domain names does not indicate bad faith.

*Harrods*, 302 F.3d at 239 (quotations and citations omitted).

Although it is undisputed that defendants have registered a number of Omega domain names, including OMEGAWATCH and OMEGATIME,[65] it is also undisputed that defendants hold a valid, subsisting, and incontestable registered trademark for "Omega" in connection with temperature measurement products.[66] Therefore, applying the sound reasoning of *Harrods* to the present dispute, the fact that a company named OE, OS, or OP with trademark rights in the name "Omega" registers hundreds of Omega-related domain names does not alone indicate bad faith. Accordingly, "Factor (VIII) cannot be weighed against [defendants] in the bad faith calculus." *Harrods*, 302 F.3d at 240.

Similarly, regarding Factor (IX), although plaintiff's marks "Omega" and "O" as used in connection with watches are inherently distinctive within the meaning of the ACPA,[67] this factor is entitled to little weight because defendants, having trademark rights in "Omega", are entitled to appropriate concurrent use of that mark in domain names. *See Harrods*, 302 F.3d at 240.[68]

66. *See supra* at note 7, and p. 26 and note 33.

67. *See supra* at pp. 17–20.

68. Factor (IV), 15 U.S.C. § 1125(d)(1)(B)(i)(IV), reads "the [alleged cybersquatter's] bona fide noncommercial or fair use of the mark in a site accessible under the domain name." The parties have not argued whether this factor applies to the present case. Further, as defendants' use of the offending domain names is ostensibly for commercial purposes, this factor appears to

**d.) Analysis of Bad Faith: Summary**

Plaintiff has offered and pointed to direct and circumstantial evidence in the summary judgment record from which a reasonable jury could readily find that: 1) Defendants never used or intended to use OMEGAWATCH.com and OMEGA-TIME.com in connection with the *bona fide* offering of goods and services pursuant to an ad campaign; 2) Defendants intended to divert customers from plaintiff's website either for commercial gain, out of spite, historical rivalry, or other reasons, by creating confusion as to the source, sponsorship, affiliation, or endorsement of OMEGAWATCH.com and OMEGATIME.com; and 3) As depicted in *Sporty's Farm*, OE previously sold the domain name sportys.com for financial gain in contravention of the spirit of Factor (VI). *See Sporty's Farm*, 202 F.3d at 499. Accordingly, plaintiff has sustained its burden under *Celotex* to preclude defendants from prevailing on their motion for summary judgment in accordance with *Celotex*.

In opposition to plaintiff's motion, defendants offered the following five key pieces of evidence: 1) Dr. Hollander's declarations; 2) Internal memoranda dated December 14, 1995, and May 26, 1996; 3) Four pages worth of printouts memorializing the content of OMEGAWATCH.com and OMEGATIME.com from roughly May of 1996 to July of 1998; 4) The content of the present hyperlink sites at OMEGA-WATCH.com and OMEGATIME.com;

and 5) The undisputed fact that defendants have not offered to sell OMEGA-WATCH.com or OMEGATIME.com to plaintiff or any third party for monetary or other remuneration.

Resolving all factual issues in defendants' favor, as the Court must on summary judgment, the Court believes that, with Dr. Hollander's declaration and attached exhibits, defendants as non-movants have produced just enough evidence to "go beyond the pleadings and by [their] own affidavits ...designate specific facts showing ... a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. While the evidence is close to "so one-sided that [plaintiff] must prevail as a matter of law," *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505, the Court can not rule out the potential for a reasonable jury crediting defendants' explanation in a manner analogous to that set forth above, *see supra* at p. 131–32, and therefore the Court concludes that there is something more than a scintilla of evidence to generate a genuine issue of material fact on the issue of defendants' bad faith. Thus, on this summary judgment record, a jury is the entity that will test Dr. Hollander's credibility on whether an advertising campaign existed and, if so, whether it was a bona fide commercial undertaking or purposefully developed to re-kindle a historical dispute with plaintiff over the parties' respective use of the trademarks "Omega" and "O".[69] Accordingly, plaintiff's motion must be denied as to defendants' bad faith.

---

have no application in the present analysis. *See Harrods*, 302 F.3d at 235–36.

**69.** The ACPA contains a safe harbor provision, which provides in pertinent part,
"bad faith intent...shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful."

15 U.S.C. § 1125(d)(1)(B)(ii).

If it is found that defendants acted with bad faith in registering and using OMEGA-WATCH.com and OMEGATIME.com, defendants will not be entitled to avail themselves of the safe harbor's shelter. *See Virtual Works*, 238 F.3d at 270 (The safe harbor provision should not be construed "so broadly as to undermine the rest of the statute...a defendant who acts even partially in bad faith in

#### 4. Damages

 The enacting legislation for the ACPA states that the statute "shall apply to all domain names registered before, on, or after [November 29, 1999] ...except that damages ...shall not be available with respect to the registration, trafficking, or use of a domain name that occurs before [November 29, 1999]." Pub.L. 106–113 § 3010.

Defendants argue that, because they registered OMEGATIME.com and OMEGAWATCH.com in December of 1995 almost four years prior to the enactment of the ACPA, OSA's claim for damages should be dismissed. In support of their arguments, defendants characterize *Sporty's Farm* as holding "damages ... unavailable because defendant registered and used domain name prior to passage of ACPA." [70] Plaintiff acknowledges that the ACPA does not permit the recovery of damages "that occur prior to the enactment of the statute" but asserts that "damages which flow subsequent to [November 29, 1999] are fully recoverable." [71]

Although plaintiff provides only truncated analysis, its legal position is correct. The ACPA imposes liability on a person who, among other requirements, "registers, traffics in, *or* uses a domain name..." 15 U.S.C. 1125(d)(1)(ii)(emphasis added). The conjunctive "or" clearly indicates that liability can flow from any one of the three listed activities. [72] Further, section 3010 of Pub.L. 106–113 serves merely to limit an offender's potential liability by precluding the recovery of monetary damages for conduct constituting any of the three listed activities before November 29, 1999.

By defendants' own admissions, OMEGATIME.com and OMEGAWATCH.com have been in continuous use from the date of registration until the present, first as a site used for selling products, and second as a conduit with hyperlinks. [73] Accordingly, plaintiff may not recover damages for defendants' registration of OMEGATIME.com and OMEGAWATCH.com in December of 1995 and any use of those domain names preceding November 29, 1999. However, if proved, plaintiff may recover damages derivative of defendants' use of the domain names after November 29, 1999. [74]

#### 5. Statute of Limitations and Laches

Defendants urge that plaintiff's claims are time barred by the applicable statute of limitations and the equitable doctrine of laches. Recognizing that the ACPA does not specify a limitations period, defendants argue that analogous state law requires

registering a domain name is not, as a matter of law, entitled to benefit from the Act's safe harbor provision.")

**70.** Defendants' Memorandum of Law in Support of *Summary Judgment* at 24.

**71.** Plaintiff's Memorandum in Opposition at 14.

**72.** *See also* 15 U.S.C. § 1125(d)(1)(D)("A person shall be liable for using a domain name under subparagraph (A) only if that person is the domain name registrant or that registrant's authorized licensee.").

**73.** Hollander Declaration ¶¶ 10–13 and 20.

**74.** Defendants' talismanic invocation of *Sporty's Farm* is inapposite because, in that case, prior to the enactment of the ACPA (on November 29, 1999), the district court had issued an injunction forcing OE and OE's subsidiary to relinquish all rights in and transfer the domain name at issue. *See Sporty's Farm*, 202 F.3d at 495 and 500. Thus, all use of the domain name by the later adjudged cybersquatter, OE's subsidiary, ceased prior to the enactment date of the ACPA, the date before which damages were not available with respect to the use of a domain name.

the application of a three year statute of limitations to plaintiff's claim. Thus, defendants assert that plaintiff's claim is untimely "because it is undisputed that OSA first learned of defendants' registration of the domain names at issue in or about May 1996 ..., which is more than four years prior to the date of commencement of this lawsuit." [75] Plaintiff's responds that its claim is timely because it filed its complaint on September 27, 2000, within one year of the enactment of the ACPA. [76]

At oral argument, counsel for defendants characterized the statute of limitations defense as a "slam dunk". Resolution of the argument is in fact as easy as a "slam dunk," but scores two points for plaintiff. [77] As with damages, Defendants' argument here is fundamentally flawed because it assumes plaintiff's cause of action under the ACPA began to accrue when plaintiff first learned of defendants' registration or use of OMEGAWATCH.com and OMEGATIME.com. Thus, defendants fail to recognize that the plain language of the statute can impose liability not only for a one time event (such as registration) but also for iterative or on-going actions (such as trafficking and using). *See* 15 U.S.C. § 1125(d)(1)(A)(ii). The statutory language thereby conceptualizes the illegitimate use of a domain name as an ongoing harm.

■ Accordingly, any injunction [78] issued under the ACPA for the forfeiture, cancellation, or transfer of a domain name in current use is a form of prospective relief. *See Sporty's Farm*, 202 F.3d at 502 ("Similarly, the injunction that was issued in this case provided only prospective relief to Sportsman's. Since it did no more than avoid the continuing harm that would result from Sporty's Farm's use [of] the domain name, there is no retroactivity problem."); *Viacom Inc. v. Ingram Enters., Inc.*, 141 F.3d 886 (8th Cir.1998)(characterizing trademark dilution under the FTDA as an on-going wrong and therefore permitting injunctive relief against conduct that began before the enactment of that statute); *Landgraf v. USI Film Prods.*, 511 U.S. 244, 278, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)("application of new statutes passed after the events in suit is unquestionably proper in many situations. When the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive"). [79] Therefore, because defendants continue to use the offending websites, no statute of limitations would bar plaintiff's claim for injunctive relief under the ACPA.

■ With respect to damages, it is undisputed that plaintiff filed the present suit in September of 2000, within one year of

**75.** Defendant's Memorandum of Law in Support of Summary Judgment at 26.

**76.** Plaintiff's Opposition to Summary Judgment at 14.

**77.** Counsel's hyperbole also runs afoul of an ancient proverb from the Near East: "One who puts on armor should not brag like one who takes it off." I Kings 20:11 (New Revised Standard Version).

**78.** The ACPA explicitly empowers district courts to order injunctive relief based solely on the use of a domain name. *See* 15 U.S.C. § 1125(d)(1)(c)("In any civil action involving the registration, trafficking, *or* use of a domain name under this paragraph, a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark.")(emphasis added).

**79.** The Court recognizes the difference between the legal doctrines of retroactivity and statute of limitations. However, in the context of injunctive relief, the concept of on-going harm renders both doctrines equally inapplicable.

the enactment of the ACPA, and correspondingly within one year of the date from which plaintiff was statutorily permitted to seek damages for defendants' continuing use of the two domain names. Therefore, the Court need not decide whether defendants' asserted three year statute of limitations restricts plaintiff's claim for damages to those occurring after September of 1997 because Congress has already limited any monetary recovery to injuries resulting from the registration, trafficking, and/or use of a domain name after November 29, 1999.

■ As a separate and independent matter, defendants argue that plaintiff's request is also time barred by the equitable doctrine of laches. Believing the applicable limitations period has run on plaintiff's claim, defendants claim a presumption of laches applies to bar "OSA's belated claims unless OSA can advance some compelling reason for excusing its unwarranted delay." [80]

Moreover, defendants maintain, they have been prejudiced by OSA's purported delay since "...defendants no longer have documents or current employees from which they can reconstruct a full picture of their early use of the domain names." [81]

Laches is based on the maxim, vigilantibus non dormientibus aequitas subvenit, meaning 'equity aids the vigilant, not those who sleep on their rights'.... It is an equitable defense that bars a plaintiff's equitable claim where he is guilty

of unreasonable and inexcusable delay [in commencing an action] that has resulted in prejudice to the defendant. A party asserting the defense of laches must establish that: (1) the plaintiff knew of the defendant's misconduct; (2) the plaintiff inexcusably delayed in taking action; and (3) the defendant was prejudiced by the delay.

*Ikelionwu v. U.S.*, 150 F.3d 233, 237 (2d Cir.1998)(quotations and citations omitted).[82] Delay results in prejudice "when the assertion of a claim available some time ago would be inequitable in light of the delay in bringing that claim.... Specifically, prejudice ensues when a defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed." *Conopco*, 95 F.3d at 191 (quotation omitted).

"The equitable nature of laches necessarily requires that the resolution be based on the circumstances peculiar to each case.... The inquiry is a factual one. The determination of whether laches bars a plaintiff from equitable relief is entirely within the discretion of the trial court." *Tri–Star Pictures, Inc. v. Leisure Time Prods.*, 17 F.3d 38, 44 (2d Cir.1994) (citations omitted).

Under the facts peculiar to this case, the Court cannot conclude that plaintiff slept on its rights. Although plaintiff knew of defendants' registration and use of OMEGAWATCH.com and OMEGATIME.com

---

80. Defendant's Memorandum of Law in Support of Summary Judgment at 26.

81. *Id.*

82. "When a suit is brought within the time fixed by the analogous statute, the burden is on the defendant to show ... circumstances exist which require the application of the doctrine of laches. On the other hand, when the suit is brought after the statutory time has

elapsed, the burden is on the complainant to aver and prove the circumstances making it inequitable to apply laches to his case." *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir.1996)(quotation and citation omitted). As already discussed, plaintiff initiated this action well within any applicable statute of limitations, and therefore defendant is not entitled to a presumption of laches.

at least as early as May 28, 1996,[83] plaintiff had no cause of action under the ACPA until the date of its enactment, November 29, 1999. Therefore, the period from May 28, 1996 to November 29, 1999, cannot constitute "inexcusable delay" for purposes of defendants' affirmative defense of laches. *See Bio–Tech. Gen. Corp. v. Genentech, Inc.,* 80 F.3d 1553, 1564 (Fed.Cir.1996)(Genentech did not unreasonably delay in bringing suit during the period beginning in 1985 and ending in 1988 because it had no infringement claim until the enactment of 35 U.S.C. § 271(g) in 1988.); *Cohen & Sons Co. v. Hearst Magazines, Inc.,* 42 C.C.P.A. 836, 220 F.2d 763, 765–66 (Cust. & Pat.App.1955)(Affirmative defense of laches presupposes failure to assert a right and therefore cannot be predicated on inaction prior to enactment of the Lanham Trademark Act of 1946 giving rise to right of cancellation.) The Court does not hesitate in also concluding that plaintiff's ensuing delay of ten months before filing this action cannot be characterized as "inexcusable."

Further, the fact that, upon learning of the existence of defendants' websites in May of 1996, plaintiff could have mounted a legal attack against the domain names under 15 U.S.C. § 1125(a)(Section 43(a) of the Lanham Act) or the FTDA does not alter the Court's laches analysis because "Congress viewed the legal remedies available for victims of cybersquatting before the passage of the ACPA as 'expensive and uncertain.'" *Sporty's Farm,* 202 F.3d at 495; *see also Virtual Works,* 238 F.3d at 267 ("[The ACPA] was required to address this situation because then-current law did not expressly prohibit the act of cybersquatting and cybersquatters had started to take the necessary precautions to insulate themselves from liability under the [FTDA].")

In addition to the absence of inexcusable delay, defendant has not established prejudice. As set forth above, after a decade or more of acrimonious relations with plaintiff, defendants' registration and use of OMEGAWATCH.com and OMEGATIME.com prompted an almost immediate warning of litigation from plaintiff. In the face of such circumstances, for purposes of a laches analysis, it is reasonable to assume that sophisticated business entities such as defendants should have taken steps to preserve or memorialize evidence to enable a later reconstruction of their early use of the domain names. Defendants' failure to do so cannot form the basis of a laches claim on the grounds of prejudice.

In conclusion, neither statute of limitations nor laches form a basis for granting defendants' motion for summary judgment.

## V. Conclusion

For the foregoing reasons, the Court has denied defendants' motion [Doc. # 73], granted plaintiff's motion [Doc. # 77] for summary judgment in part with respect to two elements of the ACPA, distinctiveness and confusingly similar, and denied plaintiff's motion in part with respect to the issue of defendants' bad faith (and the fame of plaintiff's marks).

IT IS SO ORDERED.

---

**83.** *See* Hollander Declaration Exhibit J.